UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

CARLOS MANUEL LAYER ACEVEDO,

Defendant.

REPORT AND RECOMMENDATION

20-CR-6149-DGL-MJP

---

**Pedersen, M.J.** On July 12, 2021, the Court held oral argument on Defendant's suppression motion (Def.'s Mot. For Suppression, part of Def.'s Mot. for Hr'g, ECF No. 21). In an affidavit[1] dated March 2, 2021, (Def.'s Aff. in Supp. of Omnibus Mot., ECF No. 24), Defendant stated:

> CARLOS LAYER-ACEVEDO[,] being duly sworn, under penalty of perjury, deposes and states:
>
> 1. That I am the Defendant in the above matter.
>
> 2. That any oral statements give and/or videotaped, were made because the police threatened me. The police accused me of being involved in illegal activity.
>
> 3. That I immediately asked for an attorney.
>
> 4. That any statement given was not voluntary and was coerced prior to any video being turned on.

(*Id.*)

---

[1] Defendant filed his motion in January. The Court noted that Defendant had not submitted an affidavit supporting his contention that his statements to police were taken in violation of his constitutional rights. Defendant later filed an affidavit on March 2, 2021. (Def.'s Aff. in Supp. of Omnibus Mot., ECF No. 24.)

## FINDINGS OF FACT

During the suppression hearing, Thomas VanAcker ("VanAcker"), an officer with the Rochester Police Department ("RPD"), and Timothy O'Hara ("O'Hara"), part of the Rochester Narcotics Task Force, testified. Three exhibits were also admitted into evidence: Exhibit 1: VanAcker's body camera footage; Exhibit 2: O'Hara's interview; and Exhibit 3: Statement of Rights. VanAcker testified as to what transpired before Defendant arrived at the RPD. Immediately thereafter, the government played the recording of VanAcker's body camera video, which began recording before he approached Defendant's car and started interacting with him. After VanAcker's cross-examination, O'Hara testified and described interviewing Defendant. After reviewing the testimony, exhibits, and filings, the Court makes the following findings of fact.

VanAcker was given a general description of Defendant by another officer and was instructed to go to Clay Avenue and arrest Defendant. On June 15, 2021, at 3:32 p.m., Officer VanAcker approached Defendant's car regarding a postal parcel. VanAcker wore a functional body camera which recorded the entire interaction with Defendant. (Hr'g Ex. 1.) VanAcker stopped Defendant in his vehicle on Clay Avenue, in Rochester. VanAcker removed Defendant from the vehicle he was driving and placed Defendant into VanAcker's patrol car. Only Defendant was present in Defendant's vehicle. At no point during the stop did VanAcker read *Miranda*[2] warnings to Defendant. VanAcker asked Defendant for his name, date of birth, where he lived, whose car he was driving, and whether Defendant had a driver's license.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

(Hr'g Ex. 1.) VanAcker testified at the hearing that he had questioned Defendant about where he was coming from:

> Q. You placed him in the back of your car in handcuffs I take it, correct?
>
> A. Yes, sir.
>
> Q. I'm asking you though at the meeting you had at–prior that morning, were you given any instructions to question him as to where he was and what he was doing?
>
> A. Not to my–I honestly don't remember.
>
> Q. You don't remember. But nonetheless, you did ask him what he was doing on Clay Avenue, correct?
>
> A. *I asked him where he was coming from, I believe.*
>
> Q. And that's not pedigree information, is it?
>
> A. I ask every person I stop where they're coming from.
>
> Q. I didn't ask you that, though. In your PDR, your pedigree information, that's not one of the questions you ask somebody, is it, where you're coming from?
>
> A. No.

(Tr. 19–20, ECF No. 30 (emphasis added).) However, upon review of the video of the event, VanAcker did *not* ask Defendant, "where he was coming from." The Court reached out to the counselors via email to discuss the discrepancy. Counsel for the government responded in an email stating:

> It does not appear that Officer Van Acker specifically used the words "Where are you coming from?" At the time stamp starting at about 12:34, Officer Van Acker engages in an exchange with Mr. Layer-Acevedo in which he asks Mr. Layer-Acevedo questions about, among other things, where he lived. Mr. Layer-Acevedo responded that he used to live "right there" at 222 Clay Avenue. The questioning also involved those related to pedigree information and who owned the car he was driving and driver's license information. Officer Van Acker also asked Mr. Layer-Acevedo where he was currently living and also asked Mr. Layer-Acevedo who lived "back there." Mr. Layer-Acevedo identified the person

3

>residing at the address as being his ex-girlfriend and being named "Natalia." This exchange continues until about 12:39. Without speaking directly with Officer Van Acker, I believe that this information, in general terms, encompasses the overall identification of where Mr. Layer-Acevedo had been.

(E-mail from Charles Moynihan, Esq., counsel for the government, to Nathan Jones, Esq., law clerk to the Hon. Judge Mark Pedersen, and Michael Schiano, Esq., counsel for Defendant (Aug. 24, 2021, 3:07 pm EST) (on file with Court).) At no point did VanAcker threaten or accuse Defendant, nor did Defendant ask for a lawyer while in VanAcker's presence.

The video begins at 12:33:17 with VanAcker at the wheel of his vehicle driving to Defendant's vehicle. (Ex. 1: VanAcker's bodycam footage, 12:33:17–12:33:51, on file with the Court.)  At 12:33:51, VanAcker exits his vehicle and walks to the open driver's side window of Defendant's vehicle, asking Defendant "What is up man?" as he approaches. (*Id.*, 12:33:51–12:34:00.)  The video continues:

>VanAcker: Turn the car off for me please.
>
>Defendant: What—
>
>VanAcker: Turn the car off for me.

VanAcker then opens the car door and asks Defendant to "Hop out." VanAcker tells Defendant "Put your hands behind your back—put your hands behind your back." Defendant complies and allows VanAcker to handcuff him to which Defendant asks, "What is going on?" (*Id.*, 12:34:12) VanAcker responds by saying "I will tell you in a second." VanAcker leads Defendant to the police vehicle and asks, "You got an I.D. on you?" (*Id.*,12:34:21) Defendant replies "No, left it at home." (*Id.*, 12:34:22) VanAcker then states "Left it at home—where do you live at?" (*Id.*, 12:34:23)

4

Defendant replies partially inaudibly with "I used to live right there on two two two Clay Avenue" (*Id.*, 12:34:24) VanAcker then asks, "Twenty-two or two two Clay?" (*Id.*, 12:34:34), to which Defendant says, "two two two" (*Id.*, 12:34:35). Defendant is patted down and placed in the police car. (*Id.*, 12:34:52). Once both Defendant and VanAcker are in the vehicle, Defendant asks something of VanAcker to which he replies, "Uh we will talk about that in just a minute alright?" (*Id.*, 12:35:08) VanAcker begins to question Defendant again:

> VanAcker: "What uh, what is your last name?" (*Id.*, 12:35:12)
>
> Defendant: "L-A-Y-E-R."
>
> VanAcker: "L-A-Y-E-R?"
>
> Defendant: "Yes"
>
> VanAcker: "First Name?"

A beep happens at this point obscuring the sound, where either Defendant stated his name was Carlos, or VanAcker was able to find Defendant in the database.

> VanAcker: "C-A-R-L-O-S"
>
> Defendant: "Yes."
>
> VanAcker: "Middle Initial?"
>
> Defendant: "M."
>
> VanAcker: "Birthday?"
>
> Defendant: "eleven twelve ninety-six."
>
> VanAcker: "eleven twelve ninety-six."

5

> VanAcker: "Who's car is this?[3]"
>
> Defendant: "My mom's."
>
> VanAcker: "Who?"
>
> Defendant: "My mom's."
>
> VanAcker: "Where does she live at?"

Defendant lists the address which is not audible in the recording.

> VanAcker: "Do you have a driver's license?"
>
> Defendant: "Yes, I know the number."
>
> VanAcker: "Do you? That's perfect. What is it?"

Defendant then lists his driver's license number. Another officer approaches and discusses the location of Defendant's car keys with VanAcker. After a period of silence, VanAcker begins to again question Defendant (*id.*, 12:36:50), "So your mom is the one-twenty-nine Brookhaven? And it's her car?" Defendant sounds like he affirmed the questions, however, it is unclear from the audio. (*Id.*, 12:36:55).

> VanAcker: "Oh you have a hyphenated last name? Do you have a hyphenated last name?"
>
> Defendant: "What does that mean?"
>
> VanAcker: "Like Layer-Acevedo? Is that you?"
>
> Defendant: "Yeah."
>
> VanAcker: "Oh."

After a moment of silence VanAcker asks:

> VanAcker: "Your name is Carlos, right?"

---

[3] VanAcker seems to be indicating toward the vehicle Defendant was driving.

>Defendant: "What?"

>VanAcker: "Carlos, right?"

>Defendant: "Yeah."

>VanAcker: "I just wanted to make sure that is what you said."

The rest of this statement is inaudible but VanAcker points to the computer screen and says something about Defendant's initials.

At 12:37:46, VanAcker asks:

>VanAcker: "So where are you actually living now? You said you used to live back there, but where are you living now?"

>Defendant: "With my mom."

>VanAcker: "On Brookhaven? Who lives back there? (Indicating to the Clay Avenue address)."

>Defendant: "Oh, that was my ex."

>VanAcker: "Oh your ex lives there? Does she still live there?"

>Defendant: "Yeah."

>VanAcker: "What's her name?"

>Defendant: "Huh?"

>VanAcker: "What's her name?"

>Defendant: "What's her name?"

>VanAcker: "Yeah."

>Defendant: "Natalia."

>VanAcker: "Do you know what her last name is or no?"

>Defendant: "No."

>VanAcker: "You forgot."

After more silence, another officer comes to the driver's side window and indicates where VanAcker is to take Defendant. Defendant then asks, "Can I know what is going on?" (*Id.*, 12:38:41). To which VanAcker replies with "Uh, we just got asked to stop you. So, I am not one-hundred percent sure—I'm sure when you uh—I'm sure when you get down to that building, we will be able to talk to you about that. It's our office." (*Id.*, 12:38:43) Defendant then asks, "Can you call my mom to let her know," to which VanAcker replies "Uh—yeah we'll take care of that. I am not going to call her right now, doing this with you." Defendant inaudibly asks something about if his mom will get the car back from the police to which VanAcker states "She may very well get it back." (*Id.*, 12:39:14.) The conversation essentially ends with VanAcker stating that "We'll let you talk to who you got to talk to down there." (*Id.*, 12:39:20).

Following the testimony, the parties agreed during the hearing that VanAcker's self-professed question concerning where Defendant was coming from was not seeking pedigree information and should be suppressed. (Tr. 43, ECF No. 30.) However, the body camera video shows that VanAcker never did ask Defendant where he was coming from. Consequently, the unasked question, and its unstated answer, cannot be suppressed. Nevertheless, VanAcker's question about who lives at the address on Clay Avenue was not a pedigree information inquiry.

Defendant took part in a custodial interview on June 15, 2020. (Hr'g Ex. 2.) O'Hara and United States Postal Inspector James Keenan began by asking pedigree questions such as asking if and where Defendant worked. O'Hara interviewed Defendant in the Rochester Public Safety Building, and the entire interview was recorded and submitted into evidence as Exhibit 2. At 1:13:55 in the recording, the

8

interviewers shifted focus and O'Hara stated: "So we want to talk to you about that package you picked up today." (Ex. 2, 1:13:55.) Defendant immediately responded saying, "Yeah I was going—." O'Hara cut him off by saying, "Well hang on, hang on, yeah so I just wanted to know did you want to talk to us about that? You don't have to if you don't want to." Defendant immediately responded by stating "No—that's not something under my [name?]—I was going to take it back to the post office." O'Hara then interrupted Defendant a second time and stated, "Okay, okay, hang on, before we go any further" and proceeded to explain and read to Defendant *Miranda* warnings. (Ex. 2, 1:14:13.) Neither investigator threatened Defendant nor did either investigator make any accusations prior to reading Defendant *Miranda* warnings.

## LEGAL CONCLUSIONS

The Due Process Clause prohibits the use of confessions that are not the product of a defendant's free will. *United States v. Anderson,* 929 F.2d 96, 98 (2d Cir. 1991) ("The police may use a defendant's confession without transgressing his Fifth Amendment [due process] right only when the decision to confess is the defendant's free choice." The central question in assessing whether a confession was given voluntarily is whether the defendant's "will was overborne" at the time of the confession. *United States v. Corbett,* 750 F.3d 245, 253 (2d Cir. 2014); *see also United States v. Taylor,* 745 F.3d 15, 23 (2d Cir. 2014) ("A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." (quoting *Anderson,* 929 F.2d at 99)). Whether a defendant's will was overborne is determined by examining "the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the

9

conduct of law enforcement officials." *Taylor,* 745 F.3d at 23–24 (quoting *Anderson,* 929 F.2d at 99)).

### *Pre-Miranda Statements at the Stop*

Here, the totality of all the surrounding circumstances suggest that Defendant was acting of his own free will when he elected to respond to pedigree questions and made the spontaneous statements described above. At the conclusion of the hearing, counsel argued that VanAcker's question as to where Defendant was coming from was a quest for evidence and should be suppressed. However, the body camera video conclusively shows that no such question was asked. Instead, VanAcker's questions sought only pedigree information, except for the question about who lived at the Clay Street address. Regarding that question, the undersigned recommends that the question and Defendant's answer be suppressed. The question occurred prior to *Miranda* warnings, and was not seeking pedigree information.

### *Pre- and Post-Miranda Statements at the RPD Interrogation*

Regarding the interrogation at RPD by Inspectors O'Hara and Keenan, Defendant seeks suppression of his pre-*Miranda* warning conversation with both inspectors. Most of the conversation prior to O'Hara reading *Miranda* warnings to Defendant concerned non-evidentiary background pedigree information. Defendant's spontaneous statements in response to O'Hara's mention of the topic of conversation he desired to have with Defendant ("So we want to talk to you about that package you picked up today"), and his two follow-up questions, should not be suppressed.

> The Supreme Court has held that *Miranda* warnings are required
>
> whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any

10

> words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (footnotes omitted). O'Hara's announcement of the topic of discussion to follow was not reasonably likely to elicit an incriminating response. O'Hara prudently cut Defendant off, and then asked the following questions: "Well hang on, hang on, yeah so, I just wanted to know did you want to talk to us about that? You don't have to if you don't want to." Those two questions anticipated a single "Yes," or "No" answer, not a soliloquy in which Defendant started explaining his actions. O'Hara again cut Defendant off as he started providing more information than whether he wanted to discuss the topic of the parcel with the inspector, and O'Hara sensibly read Defendant his rights without asking him again whether he wanted to talk to the inspector about the parcel.

Considering the totality of the circumstances, O'Hara was not attempting to elicit incriminating responses from Defendant with those three pre-*Miranda* questions he asked. None of the three questions should have been reasonably interpreted by Defendant as an invitation to provide incriminating information about the topic. With those three pre-*Miranda* questions, the inspector merely sought to determine whether Defendant desired at all to talk about the postal package and notified Defendant he was not obligated to do so. Following the advisement of *Miranda* warnings, Defendant voluntarily and knowingly waived his right against self-incrimination and engaged in a conversation with the officers.

11

## CONCLUSION

For the reasons set forth above, the undersigned recommends that Defendant's response to pedigree questions both at the initial stop by VanAcker, and at RPD when interrogated by Investigators O'Hara and Keenan, as well as Defendant's spontaneous statements made during the custodial interview prior to Inspector O'Hara reading *Miranda* warnings, should not be suppressed, nor should Defendant's post-*Miranda* statements. Only the question about who lived at the Clay Street address and Defendant's response should be suppressed.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.

The district court will ordinarily refuse to consider on de novo review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

IT IS SO ORDERED.

DATED: October 6, 2021
Rochester, New York

_____
MARK W. PEDERSEN
United States Magistrate Judge